For the appellate, Mr. Cox, and for the affilee, Mr. Brinkheader, you may proceed. Please the court. Counsel. Good morning. My name is David Cox. I am counsel for one set of petitioners in this case, John and Jacqueline Scheer, who are related to L.S. The other set of petitioners, of course, are represented by Mr. Brinkheader, the Davidsons. Justice Garmon was sworn in as Chief Justice on October 25th, and she stated that one of her priorities is, of course, children's cases and dealing with these types of issues. And I know that any judge in her position and your position takes these types of cases very seriously. And indeed, this is a case in which this young lady is in limbo and has a lot to face. So it's a very, very important case, as I'm sure they all are for this court. This case involves the future of a nine-year-old girl who has led, this far, a very tragic life. Her presumptive father is deceased. She lived with her mother, who was a prostitute, had drug and alcohol problems. She was in and out of the home. Her mother moved frequently. And so she's had an extremely rough life. I suppose one of the positives that has come out of her young life is she has two sets of petitioners that care about her and want to be involved in her life and are competing in the trial court and are competing for your attention today and your guidance today in this particular case. In January, almost a year ago, her mother died, and as best as we can tell, she lived for one to two days in the house with her deceased mother. So if her life wasn't rough enough before then, it certainly was aggravated by that development. Her mother's nearest relatives, her mother's mother, is since deceased and has one remaining sister, which the record will show has some fairly serious health problems. The grandfather, Jessica, the mother's father, has been divorced from Mary for several years. So he is, I guess, with houses in the West Coast and in the East Coast, he's been somewhat in and out of the family. But none of these people were in a position to take the minor in this case. So what happened shortly after January, and what I suppose is somewhat of an unofficial involvement by Webster Cantrell Hall, an associate or a counselor from Webster Cantrell Hall, was involved, the record will show, somewhat, although she didn't testify at trial, the file of how the case was handled, at least the state was involved to some degree. And at least unofficially, since there was no court case open, placing this young lady at the home of the former foster parents, which was Mr. Brinkhotter's clients. Counsel, you say the state was involved, and of course I know we had this issue of, was a report written and a denial of report, and then you show that there was a report, and then the person was subpoenaed, and there was a motion to quash the subpoena, and Judge Webber said he wasn't going to consider anything related to that report or that person's opinion. But other than that, what is there as far as evidence that the state was involved? I mean, as I recall it, the child reached out to the foster mother due to the circumstances with her mother being, you know, unable to awaken, and her talking to a neighbor or someone who had come over to check on things, and basically the sister, the mother's sister and the mother's mother determined that the child should go with the former foster parents. I mean, is there some evidence of anything other than that being the way things worked out? There was testimony at trial from the minor's grandfather, Mr. I think it's Schoonhauer, certainly, the aunt, Jennifer Wolper, that Lindsay Seitz, this representative from Webster Cantrell Hall, was on the phone and involved in ratifying the placement with the Davidsons. My understanding is that Ms. Seitz even went to Charleston to interview Lola to check on the circumstances. There were DCFS people from Charleston that were involved. I understand there was very little testimony because Judge Webber ultimately barred release of the file and excused Ms. Seitz from having to testify at the trial, but there's some evidence that she was orchestrating this. I beg your pardon? Ratified how? Well, they were looking to her to see if DCFS was going to take custody of the minor and open an official file, and there was at least some testimony to indicate that if the former foster parents were willing to take the minor and the family at that time was okay with that, that DCFS wasn't going to act contrary to the family's wishes and would close their file. Ultimately, when Mr. Brinkhotter's client filed a petition for guardianship after she had physical custody of the minor, Ms. Seitz did write a multi-page report that would indicate that that was a proper placement and they were the best place for her to be. But that was after they had already had the child? That was after they had the child. The testimony did establish that she was involved after the minor's mother died and had some involvement in basically approving the arrangement. The family needed to have permission or to know if DCFS was going to act to place the minor somewhere else. Well, you said two different things there. The family needed to have permission or know if DCFS was going to be opposed. I've read the record and the testimony at the hearing and in my opinion this whole notion of there was some conspiracy or the state was somehow acting to make sure that the foster parents got this child, I just don't think that really is borne out by the record. Well, it would be nice if we had more of a record. It would be nice if the trial court had ordered Ms. Seitz to testify and turn over her file and we knew more. The court probably knows that there's an adoption contest now in Macon County and Ms. Seitz has yet to testify but will testify and there's more evidence concerning that involvement now. I realize that record's not before you. So there's kind of a dearth after she's placed with the Davidsons and she writes this report in support of their petition for guardianship of any further evidence in their involvement. But I know that the family wasn't sure what the state was going to do. There are federal and state mandates that if the state gets involved in any capacity and certainly there's no disagreement over whether or not Webster Cantrell is a contractor for DCFS, there are state mandates that require placing this young lady, if possible, with blood relatives or people that have higher priority. Even federal funding is based on considering blood relatives and considering placement in proper priority. In this particular case, what I mean by ratify is there was some evidence that there were conversations with her and she was okay with this arrangement. If the Davidsons were going to accept the minor and the minor wanted to go to the Davidsons as far as anybody knew at that point, the DCFS wasn't going to act contrary to the family's decision at that point. And that was all before we were aware that the mother had passed away and before the Shears became involved in the case again. So certainly we weren't involved in those discussions. Now I fully recognize that this court and any appellate court is going to give a trial court broad latitude in these types of cases and it's going to support the trial court decision unless it's clear abuse of discretion. I read an interesting opinion that I just came across in the last couple days, Sheridan, which was published on October 13, 2013, written by Justice Harris from this court and I believe Justice Pope was on that panel. And so important principles that we recognize in the law and in the Fourth District were articulated in that case on this manifest weight standard. Even with this deference to the trial court, a reviewing court will overturn a trial court's in this case placement. If it's against the manifest weight of the evidence, it's manifestly unjust or results in a clear abuse of discretion. A trial court abuses its discretion when it acts arbitrarily without conscientious judgment or in view of all the circumstances in a manner contrary with the record. Findings that are against the manifest weight of the evidence, when it appears that the manifest weight of the evidence point in another direction. I realize there are all kinds of factors to be applied by the court. Depending on what statute this court would operate under, under custody or visitation or guardianship type issues, we could wind up under the Adoption Act, we could wind up under the Guardianship Act, we could wind up under the Juvenile Court Act or the Illinois Marriage and Dissolution of Marriage Act. In this particular case, the factors outlined in the line of cases in the statute governing adoption and guardianship are more applicable. As the Supreme Court stated in Irmo Ashley K., the bottom line, of course, is that this court has to make the determination on whether the trial court's decision was in the best interest of the minor. My argument in this case is that clearly the record pointed toward the opposite conclusion for the following reasons. Number one, the trial court failed to adequately weigh and consider that the Shears are blood relatives. The trial court ultimately concluded, although there was some debate over whether they were first cousins or second cousins, they are first cousins once removed, which are defined as first cousins, and that's because the minor and the petitioner, John Shear, share the same grandparents in the line, but are in a different generation. Even the trial court, in its docket order, concluded that they were probably first cousins once removed. Illinois law prefers, as do the federal mandates, placing a child with relatives if they're available. In this court, it doesn't appear like the court gave sufficient weight to the fact that the Shears were related and the Davidsons are not. As a matter of fact, the Davidsons did very little at that point to encourage any relationship with the minor and any relatives outside of the two that were involved, or the two or three that were involved in January in this placement issue, I suppose because they were trying to prevent other people from having some influence over the minor at that point in time. The second reason that this decision is against the manifest weight of the evidence is the court failed to consider this young lady's racial background. Her father was African American and her mother was Caucasian or white, and that is exactly the composition of my client. That is exactly the composition of another uncle, Mark Shear, who testified at trial. Now the trial court does address that issue in its order, correct? The trial court basically refers to the fact that it is mentioned that my client, or John Shear, has the same racial background as the minor. And then goes on to speak about the minor's current environment and whether or not it appears at this time to have a detrimental effect. Well, there are two ways I would answer that question. First of all, if the argument is that with her African American background she is well served by being placed in a white church, in a white family, in a white community, in a white school, and not having any contact whatsoever with people with her similar background, then that would be what the court was saying, that her placement and her current situation with her foster family, or what used to be her foster family, was the best possible placement for her. But the other way to address this is the fact that any issues that may result either in regards to problems that she has as a result of her experience, or wanting to relate to people with similar backgrounds, or to deal with the fact that she is in a situation in which testimony would establish she may have difficulty relating to either side of her background because she may not be fully accepted, those issues aren't necessarily manifested at age. So, these are issues she'll have to deal with as she gets older, as she gets into adolescence, and as she matures. So, I think the trial court's view that there aren't any problems that were produced, I suppose, by way of evidence or testimony at age 8 doesn't really indicate that it's not a future issue. Now, was there evidence that the church they attend is a white church, and she's in public school, correct? She's in Macon, Oregon, Your Honor. That's a public school, correct? It is a public school, a rural public school, 98% white, south of Decatur. And I'm a graduate of that school. You probably didn't know that. We played them in soccer once, but I'm afraid I've only been there once. 1986, we were the Ironmen then, Macon Ironmen. Mr. Cox, I wanted to ask you, doesn't the foster family, the Davidson's, don't they have another foster child of at least mixed race? They do. My recollection, Your Honor, is that trial testimony indicated that he was 3 or 4, he was substantially younger than she was. One of the ways that the Davidson's proposed that the minor could work through these types of issues was to be able to relate to her younger brother, and I think that testimony was refuted by Jacqueline Shearer, who was certified as an expert in social work, indicating you would need somebody older with more experience and somebody with competence in counseling. But still, to a certain degree, I acknowledge she would be able to relate at least in that similar background to, and I don't remember whether he was mixed race or whether he was African American, but certainly there would be some relationship there. I have no doubt. So I mentioned the racial background and the blood relative. The religious background, the Shearers testified that their entire family is Roman Catholic, and indeed the Davidson's are Protestant. But the child was not raised Roman Catholic, isn't that true? As far as we know. I suppose it's not a far stretch to indicate, as I recall, testimony indicated that Jessica, the minor's mother, was raised in a Roman Catholic church, but it's not a far stretch, and I don't mean it in a condescending way, it's not a far stretch that she had so many sociological problems or drug abuse and alcohol and so forth that she may not have been an active church member through much of her life. So probably the only church this child knew was the Davidson's church. It's possible. Evidence just doesn't establish that conclusively. But did the evidence establish that when she was living with the Davidson's previously, she attended their church? I don't recall whether the evidence indicated that she did when she was placed there with the foster family. It's quite possible that she did. I know the evidence indicated that she does now and has since her placement in January. The other issue is this weight of expert testimony in terms of adding to the other issues that Dr. William Scheer, you may recall from our generation, the physician for the bubble boy who had an immune deficiency problem and became world famous as this boy lived out his life in a bubble because he couldn't be exposed to the atmosphere or germs. Dr. Scheer, who was John and Jacqueline's father, was certified as an expert in three areas, general medicine, pediatrics, and basically immune deficiency diseases. And Jacqueline Scheer was certified in terms of counseling, particularly in children's issues. Dr. Scheer testified, and this was irrefutable, that there was a complete need to have this young lady evaluated psychologically, medically, to test whether she had HIV or other blood-borne pathogens that may create problems in STDs, so forth. The problem that Dr. Scheer had is there's just no baseline. Here you have a girl that's been raised in dismal circumstances. Granted, her life may be more stable at the moment, but the history is not there. And we had no idea what psychological issues remain, what counseling issues may remain or need to be dealt with, and what physical medical issues. It seems to me like the court discounted that. These opinions, though, were based on no contact with the child, right? He never examined or spent time with or evaluated the child in any way. No, he wasn't permitted to. But I still think somebody who's been a physician for 47 years can look at a situation and evaluate risk. I practice often in environmental law, and we're regularly called upon to evaluate risk based on exposure or something that's happening in the environment, project what will happen to the public or what will happen with public health. That's exactly the situation here. And many of the recommendations were based on assumptions regarding possible consequences from the mother's lifestyle, that it's possible since she was a drug user, the child may have been exposed to the mother engaging in prostitution or may have possibly been exposed to nefarious individuals being present in the home acting inappropriately with the child, but all just kind of based on assumptions regarding the mother's lifestyle. And what's the easiest way to address those issues? I mean, you're exactly right. It would have been an easy step for either the Davidsons or the court to permit access, to permit a physical and a mental evaluation, and to have that as a baseline. I mean, I think you point back to an issue that points to a deficiency in the court's decision here. Are we to assume that she's not at risk in any way? Are we to assume that three and five and seven years from now, there will be no manifestation of acting up or problems as a result of what she's been exposed to in her background? Are we to assume that there are absolutely no medical or scientific issues that will ever surface? Are we to assume... But would you assume that the Davidsons wouldn't take her to a physician if they thought she needed it? The Davidsons offered testimony that they would counsel her through and indicate that she prayed hard enough that she could resolve these issues and also indicated that when she complained of problems with her genitals, that they took her to a general practitioner who, as I understand it, didn't examine her but basically said, it's probably dry skin. I wanted to ask you a question before you run out of time. Yes. You, in your reply brief, referred to affidavits attached to the police brief. I couldn't find any affidavits. You moved to strike those in your reply brief. May I check the brief real quick? Sure. I think I was pointing toward this sheer family tree and the relationship chart that were not introduced at trial or exhibits at trial that have been added as part of Mr. Brinkhotter's brief. Okay. So they're not affidavits. They were charts of some kind attached to the book. They were additional documents, yes. Did you review them? Were there any misstatements in them? I assume if there were, you would have reflected those in your reply brief. So your main objection is they weren't introduced in the trial court. My presumption was that the appellate court would deal with just the records that existed in the trial court and that this wasn't an opportunity to even add new exhibits or add new charts. Do I think there were misstatements? I see that my time has expired and I finished briefly. I trust the court's ability to weigh those issues. Mainly, I've never filed a motion to strike in an appellate court case before. My main concern is that there was a dearth of authority in the respondent's brief or the appellate's brief to support his position, and I know that there have been many times this court has frowned on that while developing your argument with authority. Thank you for the opportunity. Thank you, Mr. Cox. Your Honor, do I need to reserve time for rebuttal or will that be automatic? Automatic. Mr. Brinkhotter, do you think you could speak a little louder? That microphone won't help you. I have reviewed my brief this morning and I don't have a great deal of things to say that is not already in the brief. I would just comment that if we start with the judge's order, his docket entry order, and work back from there, you can see that his docket entry order is well supported by the record. We have a child who is nine years of age who had found herself in a circumstance which was very difficult and traumatic who had already spent, as the judge said, a third of her life with the Davidsons, a third of her life in a stable environment with two decent people, with a nice family who were involved in the church, in a church, church activities, and she has exposed to a church family and a home family that included a child of a, I don't quite recall off the top of my head what the racial background of the three-year-old child was, but I can tell you that I met the Davidsons through my work as a contract attorney with DCFS where I do subsidized adoptions and they adopted one of the children in their household was adopted. And this child basically on the, I think it was the 23rd of January of this year, of last year, basically hit the lottery. Her family made a wise decision to have the child go stay with a stable family that she knew and the involvement of Lindsay Wise in placing her with the Davidsons still hasn't, to me, been shown by the record and I don't think there was any involvement. My recollection of the testimony was that there was some conversations with the grandmother, Mary Shear, and the aunt, whose sister was the child's mother, to place the child with the Davidsons because she knew them and this would relieve the child of the traumatic circumstance and place her in somewhere that could, where she would be able to deal with her grief and her loss and to basically live life. And that's what she was doing from that point forward to today. I don't think a child is a cupid doll that can be picked apart and analyzed and unscrewed and taken apart and put back together again by experts. I think that the thing to do with a child in this circumstance is to place her in a stable environment, see what comes next, and if problems arise, to deal with it. And how better to deal with a loss such as this child experienced than to place her where she knows someone, where she's already integrated into the family and reintegrated into the family and place her in a place where people already care about her. And for the Shears to be granted guardianship in this case would have resulted in the child being removed, torn from that environment where she knows her church activities and her church friends and her family and her schoolmates and her brothers and sisters and her foster parents and transport her 2,500 miles away to a new place with new people that she's never met. However well-intentioned the Shears are, they are not an adequate substitute. I think the judge's order adequately addresses the claims of the appellant. She doesn't need to be dissected and cut apart and put back together. She is very well integrated into a home where she knows everyone, and there wasn't any need to put her under a microscope and analyze her and assume that she has sexually transmitted diseases and assume that her mother exposed her to drugs while she was pregnant and assume that she has suffered a trauma that is insoluble. These, the way to deal with, children are very flexible. They have a remarkable adaptability to recover from what we adults perceive as an insoluble set of circumstances. And this child has done just exactly that. To risk her future on the unknowns of being transplanted to California and placed as, again, once again an only child with two working parents and being taken care of in school and then in daycare and so on and so forth, as opposed to being taken care of by Emily Davidson, who's a stay-at-home mom, where she has brothers and sisters to play with and she has activities. This child is so busy now that she doesn't have time to worry about grief and sorrow. This is the best medicine that this child could ever have, is to be placed with the Davidsons. And I say that the decision of the family to place her with the Davidsons that day was nothing less than a godsend for this poor child. That's really all I have to say about this. And I really do think that the record supports the decision of the trial court in placing the guardianship of the child with the Davidsons and keeping her in a familiar environment. And that's all I have to say about it.  Bob? Very briefly, Your Honor. I guess the definitive issue on this case, in part, is going to be what your presumption in terms of scientific evidence and the need for scientific evidence is in this case to support the decision. Lola wasn't just pulled out of a generic class. We know that she is at risk, given her background, and we know that she was removed from the house twice because she was at risk. We don't have to speculate on that. So you have a world-famous pediatrician and four levels of expert testimony, given his three qualifications and Ms. Scheer's qualification, that are telling this court and told the trial court, you need more information. She needs to be evaluated psychologically. These are problems that will manifest themselves in the future. I'm talking about dissecting her. Are we going to ignore the possibility that she may develop psychological issues that are going to surface as a result of this? Should the trial court have ignored the possibility that we live in a remarkable age in terms of obtaining scientific evidence that would tell us whether or not she's at risk? The trial court discounted all of the expert testimony and said, I can't see any problems now, and so I'm going to go ahead and not weigh that factor very heavily. I would argue that this court should do the exact opposite, if no other issue in this case, blood relative, racial background, religious preference, weighs as heavily as this court should weigh the lack of scientific evidence in this case as a basis for reversing this decision. It should be sufficient. This trial court ignored any steps or authority it had to get further information that would allow us not to speculate on the future of an at-risk child. This court and the Davidsons, the record will show, prior to the guardianship hearing they had done very little to have any kind of an evaluation or any kind of an analysis. That information would have been very helpful, and the lack of it, I think, calls the question into play. The guardian ad litem could have been a safety valve in terms of seeking that information or pressing that issue. I've served as a guardian ad litem in numerous cases, and I know attorneys are well-meaning in that role, but we're not child psychologists, and we're not medical doctors. So if we're not going to be an impetus as a guardian ad litem to try and press for the best information the trial court can have, and this court affirms such a decision, then basically we're moving forward with this decision while ignoring any possibility that with the state of medicine and science we could learn what this young lady really needs, what she really wants, and what is really in her best interest. I don't think you can make a decision in her best interest, and the trial court couldn't without that information. Thank you for your patience. Thank you, Mr. Cox. Mr. Brinketter, I had one question that I meant to ask you when you were up here. Do you have any objection to the motion to strike your attachments to your Pelley brief? Well, I think they're demonstrative only, and I don't... Demonstrative, does that mean? Yes. His objection was that they weren't introduced into the record in the trial court. No, they weren't. Dr. Shear testified that the child was a second cousin once removed, and that is all that these exhibits show. And I don't think there's any evidence in the record whatsoever to the contrary, and no challenge is made to his claim that the child is a second cousin once removed, and all these charts do is demonstrate how that is correct. So I think they support Dr. Shear's testimony, which I think is important when you consider the application of the ICPC statute, basically. I think that there's little support in the record for the idea that the ICPC clearance was not obtained. There probably isn't. I didn't really make a focus on that. I just addressed the case today in terms of the merits of the judge's decision. Thank you. I take this matter under advisement and stand in recess until the readiness of the next case.